IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COMCAST OF CALIFORNIA I, INC., COMCAST OF CALIFORNIA/ MASSACHUSETTS/MICHIGAN/UTAH, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>THE CITY OF WALNUT CREEK, CALIFORNIA, A MUNICIPAL CORPORATION OF THE STATE OF CALIFORNIA,<br><br>Defendant.<br>_____/ | No. C 05-00824 WHA<br><br>**ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

## INTRODUCTION

In this action under the Cable Communications Policy Act, 47 U.S.C. 521, *et seq.*, plaintiffs Comcast of California I, Inc., and Comcast of California/Massachusetts/ Michigan/Utah, Inc., who hold expired cable franchises, move for a preliminary injunction to prevent defendant City of Walnut Creek from conditioning the issuance of construction permits for a system upgrade upon finalization of a renewal franchise agreement.

## STATEMENT

**1.  COMCAST'S CABLE FRANCHISES WITH WALNUT CREEK.**

Plaintiffs are late-comers into a story that began in 1986. On February 18, 1986, the City of Walnut Creek and United Artists Cablesystems of California entered into a fifteen-year

1  cable-television agreement authorizing UACC to operate a cable-television system in Walnut
2  Creek. The expiration date for this agreement was February 17, 2001. On June 28, 1988, the
3  City entered into a separate agreement with Televents, with an expiration date of June 27, 2003.

Later, in 1999, AT&T Corp. acquired the two franchises when it merged with Tele-Communications, Inc., which had previously merged with both UACC and Televents. Thereafter, the City and AT&T entered into a Transfer of Control Consent Agreement, which provided:

> In the context of negotiations with the City for the renewal of their franchises following expiration of the current franchise, Franchisees will agree to an upgrade of their cable system in Walnut Creek to a system with a capacity of not less than 750MHz with two-way capability, and to complete and fully activate such system within four (4) years of the date of the renewal.

In 2002, Comcast merged with AT&T Broadband. As a result, Comcast acquired the UACC and Televents franchises from AT&T. On September 16, 2002, Comcast entered into an almost identical transfer agreement with the City.

Under 47 U.S.C. 546, a cable operator may request commencement of a franchise-renewal proceeding during the six-month period which begins with the 36th month before franchise expiration. On May 18, 1998, UACC sent a timely letter to the City formally requesting the City to commence a franchise-renewal proceeding. Televents sent a similar letter on July 12, 2000.

Inasmuch as no renewal agreement had been reached by the time the UACC franchise expired in 2001, the City and UACC/AT&T entered into a six-month temporary extension of the UACC franchise. It provided for an extension until August 18, 2001. The parties agreed that

> UACC shall not rebuild, upgrade, or otherwise construct or install any lines, equipment or elements of a cable system within City streets or other City property without entering into a separate written agreement with City and otherwise complying with the requirements of the Walnut Creek Municipal Code.

2

1   The extension agreement also stated that UACC would continue to pay the City a franchise fee.

2   Finally, the extension agreement provided:

> This Agreement is for the sole and limited purpose of providing additional time for the parties to negotiate a renewal of the cable franchise and to complete both UACC's and the City's obligations under Section 626 of the Cable Act of 1984. This Agreement shall not be deemed a "renewal" of the Franchise Agreement as that term is used in federal law. To the extent of any conflicts between this Agreement and the Franchise Agreement, this Agreement shall prevail. Except as specifically provided herein, this Agreement shall not in any way affect any of the terms or conditions of the Franchise Agreement or any of the rights or obligations of the parties thereunder. Except as specifically provided, this Agreement shall have no effect on the ongoing renewal negotiations between the parties, nor shall it constitute a waiver of violations, if any, of the Franchise Agreement or federal state or local law including the provisions of Section 626 of the Cable Act of 1984.

The City and Comcast did not enter into any additional written agreements to extend or renew the UACC franchise. No extension agreement was ever made with respect to the Televents franchise. At present, there is neither an extension agreement nor a renewal agreement in effect. Yet, both sides are continuing to perform as if extensions were in place.

   **2.   COMCAST'S DESIRE TO UPGRADE ITS CABLE SYSTEM.**

Comcast and its affiliates provide cable services to numerous communities in the Tri-Valley area that includes Walnut Creek. Comcast has upgraded its cable system in almost all of the communities it serves surrounding Walnut Creek, including Concord, Danville, Clayton, Moraga, Pleasant Hill, and Martinez. It wishes to do so in Walnut Creek.

Comcast's cable system in Walnut Creek now consists primarily of coaxial cable and has a carriage capacity of 450 megahertz (MHz) of radio-frequency bandwith. This is less than the capacity of the upgraded facilities in surrounding communities. In seeking to upgrade its Walnut Creek cable system, Comcast would integrate coaxial cables with fiber-optic cables, creating a Hybrid Fiber Coax (HFC) system with a capacity of 860 MHz. With an 860 MHz HFC system, Comcast could offer consumers a wider range of services and additional channels currently unavailable through its 450 MHz system, including digital-video programming services, high-definition television, Video on Demand, and high-speed Internet service (Compl. ¶ 35–37). The only other cable operator that holds a franchise in Walnut Creek,

1  Astound Broadband, currently offers consumers HDTV, VOD, and high-speed Internet service,
2  as well as 78 more video channels and 29 more pay-per-view channels than Comcast
3  (Compl. ¶ 86; Exh. 23). Comcast wants to remain competitive.

### 3. FORMAL FRANCHISE-RENEWAL NEGOTIATIONS.

Under 47 U.S.C. 546, cable franchises may be renewed through either a formal or informal process. Comcast's predecessors invoked their statutory right to the formal administrative-review process in their letters to the City dated May 18, 1998, and July 12, 2000. Section 546(a) then required the franchising authority to "identif[y] future cable-related community needs and interests" and "review[] the performance of the cable operator under the franchise." To accomplish this task, the City entered into a consortium with other nearby communities who had also granted Comcast a franchise and whose franchising agreements were up for renewal — including Concord, Clayton, Danville, Moraga, Pleasant Hill, and Martinez. This process, termed "community ascertainment," began in 1999 and was completed by the consortium in 2004. On July 23, 2004, the City issued a "Joint Report on the Community's Cable Related Needs and Interests and Request for Renewal Proposals."

Section 546(b) provides that after community ascertainment has been completed, the franchising authority may request that the cable operator submit a proposal for renewal, may require the cable operator to include in the renewal proposal a proposal to upgrade the cable system, and may establish a deadline for submission of the renewal proposal. Pursuant to Section 546(b), the City set a deadline of October 3, 2004, for submission of renewal proposals. Comcast then requested that the deadline be extended for thirty days. This request was granted. Comcast requested an additional ninety-day extension, and then another 45-day extension. Both were granted. Comcast then requested yet another extension until August 1, 2005. The City considered this request excessive and instead agreed to extend the deadline to May 20, 2005 (Ans. ¶ 73; Opp. 5). The most recent resolution by the City Council indicates that yet another extension has been granted until July 5, 2005 (Supp. Opp., Exh. 1, Finding 6). This cascade of postponements by Comcast is a significant factor in the outcome on this motion.

**4.    INFORMAL FRANCHISE-RENEWAL NEGOTIATIONS.**

Pursuant to 47 U.S.C. 546(h), informal negotiations regarding a franchise-renewal agreement proceeded alongside the formal process and included discussions specifically related to a cable-system upgrade. There is disagreement among the parties about what, if any, tentative agreements were reached and whether these agreements pertained to a proposal to renew the franchise or merely to rebuild the cable system. Comcast and the City agree that they began negotiating a system upgrade in Fall 2002. The City contends that it agreed to consider reviewing the design and environmental impact of the upgrade in order to expedite commencement of construction, pending the negotiation of a "rebuild agreement" (Opp. at 7; Valle-Riestra Decl. ¶ 7). Comcast contends that the City initially stated that it would not make the issuance of permits contingent on a franchise-renewal agreement but merely wanted Comcast to submit information necessary to conduct an environmental review pursuant to the California Environmental Quality Act (Compl. ¶ 43–45). In support of its contention, Comcast now tenders a letter dated November 15, 2002, from City Attorney Paul Valle-Riestra to AT&T, stating (Compl. Exh. 6) (emphasis added):

> The City is not "refusing to issue" permits until franchise renewal is complete, nor is the City refusing to issue permits at all. The City is simply requiring AT&T Broadband to submit information necessary to process permit applications . . . This information is necessary for the City to comply with its legal obligations under the California Environmental Quality Act and to properly oversee construction of the rebuilt system within the public right-of-way.

Representatives of Comcast and the City met on June 26, 2003, to discuss the rebuild. In a letter to the City dated July 21, 2003, Comcast summarized the meeting as follows (Opp. Exh. K) (emphasis added):

> The City has made it clear that in order for Comcast to receive permits from the City to upgrade its cable system, a separate agreement or new franchise agreement was required. *Although we find this to be an unusual request, we are willing to discuss a separate agreement.* The purpose of the meeting on June 26th was to formally begin this discussion.

Nonetheless, in the letter Comcast agreed to "provide a response to the issues that you indicated need to [sic] addressed in a separate construction agreement."

5

A later letter to Comcast from Mr. Valle-Riestra dated October 29, 2003, reflected a continuing disagreement among the parties as to whether the parties needed to enter into a new franchise agreement or an interim agreement prior to commencement of the rebuild. It noted that the City had received no response to the issues raised in the June 26th meeting. It also stated (Compl. Exh. 7; Opp. Exh. M):

> I will repeat an offer I have made to Comcast on numerous occasions. Attached is a draft franchise agreement that is almost word-for-word the same as the franchise agreement with Seren. If it is acceptable to you, I will immediately recommend approval to the City Council. Upon completion of CEQA review, the City could then promptly begin issuing encroachment permits for the rebuild. If the attached is not acceptable to you, perhaps it can at least be a starting point for discussions about an interim agreement.

Both sides can point to letters — or other agreements such as the 2002 "Transfer of Control Consent Agreement" — supporting their respective arguments as to whether a renewal agreement would need to be reached as a condition (or not) of a rebuild. Significantly, there is no conclusive bilateral agreement so stating. The record presented to the Court is inconclusive as to whether an estoppel should be found from the course of negotiations presented here. The trial record, however, may well better illuminate this issue. At a minimum, however, Comcast, by its own admission, has known since July 2003 — almost two years — that the City has been insisting on finalization of a renewal agreement as a condition of the upgrade.

**5.  THE DESIGN REVIEW COMMISSION'S DECISION ON COMCAST'S PLANS TO UPGRADE.**

On February 3, 2004, the City issued a certificate of application status. It recognized that Comcast's application was complete for review of the rebuild design by the City's Design Review Commission. On July 30, 2004, the City adopted a mitigated negative declaration. It required Comcast to comply with numerous measures as part of its cable-system upgrade, including conditions affecting aesthetics, biological resources, geology and soils, noise, public services and transportation/traffic. After environmental review pursuant to CEQA, the City's Design Review Commission approved Comcast's plans to upgrade its cable system, subject to

6

1  fifteen conditions in September 2004.  Comcast agreed to all conditions except
2  Condition No. 14, which provided (Compl. Exh. 10) (emphasis added):

> This approval relates only to the proposed design of the rebuild and does not in any way authorize any construction or use of public rights-of-way.  *No work on the proposed project shall be performed and no encroachment permits or other permits for construction shall be issued until a new franchise agreement or other agreement authorizing the proposed project has been approved by the City Council*, and the terms and conditions of the agreement are reflected in the design plans reviewed and approved by the Planning and Engineering Divisions.

The September 2004 action stated that it was "appealable to the City Council."  In early October, Comcast appealed Condition No. 14 of the September 2004 decision to the City Council, which referred the appeal back to the Design Review Commission.  On November 17, 2004, the Design Review Commission denied the appeal.  On November 24, 2004, Comcast appealed the Design Review Commission's decision for a second time to the City Council.  The appeal was originally scheduled to be heard on March 1, 2005.  In mid-February, the City informed Comcast that the hearing had been postponed until May 3, 2005.  Plaintiffs then filed the present action seeking injunctive relief to prevent the City from enforcing Condition No. 14.  They assert subject-matter jurisdiction pursuant to 28 U.S.C. 1331, 47 U.S.C. 546(e), 28 U.S.C. 1983, 28 U.S.C. 1337, and 28 U.S.C. 2201.

On May 3, 2005, the City Council denied Comcast's appeal of Condition No. 14.  As part of the resolution denying Comcast's appeal, the City Council ordered its staff "to promptly negotiate an agreement."  The City Council clarified that the agreement should address construction procedural requirements, system architecture, and other routine terms related to construction mitigation, system design, compliance with agreements and codes, and enforcement, but it also noted that "[t]he agreement should NOT address financial support for public, educational and governmental access channel operations or place any restrictions on transmission technology" (Supp. Opp., Exh. 1, Finding 14).  The parties are continuing to negotiate, at least informally.

**ANALYSIS**

To obtain a preliminary injunction, the moving party must show either (1) a likelihood of success on the merits and the possibility of irreparable injury, or (2) the existence of serious questions going to the merits and the balance of hardships tips sharply in its favor. A court must also consider whether the public interest favors issuance of the injunction. "This analysis creates a continuum: the less certain the district court is of the likelihood of success on the merits, the more plaintiffs must convince the district court that the public interest and balance of hardships tip in their favor." *Southwest Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 917–18 (9th Cir. 2003).

1. **LIKELIHOOD OF SUCCESS ON THE MERITS.**

The essence of the problem is this: The City has granted all permits and stands ready to allow plaintiffs to proceed with their upgrade as long as plaintiffs first come to an agreement on the terms of renewal of the now-lapsed franchise agreement. Is this condition unlawful? That is, do plaintiffs have a right to rebuild their physical infrastructure even before the negotiations over a renewal have run their course and even before we know whether plaintiffs will, in fact, be the next franchisee? One short answer is that the Act provides a judicial remedy if plaintiffs make a formal renewal proposal and it is wrongly rejected. 47 U.S.C. 546(e). Rather than follow through on this remedy by submitting a formal renewal proposal, however, plaintiffs have sought to leap over this statutory remedy. Plaintiffs have repeatedly postponed pursuit of a formal renewal proposal leading up to this formal remedy. Plaintiffs' alternative theories for immediate relief are not convincing. If plaintiffs wish to assert their statutory rights, they should tender a formal renewal proposal under Section 546(b), insist on a timely response, and then sue if it is rejected.[1]

This order now addresses each of plaintiffs' claims in turn.

---

[1] Pursuant to 47 U.S.C. 555(a), judicial review is also available for any "final" decision made by a franchising authority through the "informal" franchise-renewal process pursuant to Section 546(h). This provision, however, is not the alleged basis for subject-matter jurisdiction (Compl. ¶ 5). The alleged basis is Section 546(e), which provides for judicial review of the formal franchise-renewal process only. There has been no such rejection of a formal franchise-renewal proposal.

8

### A. Cable Act Claims.

#### (i) *Plaintiffs' Main Argument.*

Comcast advances a two-step argument. In the first step, Comcast argues that despite the expiration of its cable franchise, the franchise has continued by operation of federal law and will continue to do so until, if ever, the renewal procedures under Section 546 are completed. In the second step, Comcast argues that any and all franchises, including all such holdover franchises, carry with them a statutory right under Section 541(a) to upgrade the cable system. There is no authority on point.

With respect to the first issue, there are three possible outcomes: (1) when a franchise expires, it ends without any continuing vitality whatsoever; (2) when a franchise expires, the operator and the franchising authority can continue under an arrangement that amounts to a holdover tenancy-at-will, subject to termination by either side; or (3) the original franchise agreement remains wholly in effect until renewal procedures pursuant to Section 546 are completed, as argued by plaintiffs.

In support of the third construction, Comcast offers two unpublished decisions. *Time Warner v. Briggs*, Civil No. 92-40117-XX-K (D. Mass. July 22, 1992); *Continental Cablevision of Massachusetts, Inc. v. Anthony*, Civil No. 95-12789 (D. Mass. Dec. 28, 1995). Although those orders granted the cable operators injunctive relief, they fail to support Comcast. In both cases, unlike here, the plaintiffs sought an order preventing the expiration of the franchise prior to expiration. In both cases, the courts ordered that the franchises continue in full force and effect, assuming expressly that otherwise the cable operators would have no authority to continue operating. *See Briggs* at 1–2 (noting that if the franchise were allowed to expire, this would leave the cable operator "without authority to operate a cable television system in the [towns]" and the cable operator "will have been denied a renewal of its licenses without the protection of the procedures specified" in 47 U.S.C. 546); *Anthony* at 1–2 ("Continental would be compelled either to operate its [] cable system without a license in violation of law or to shut down the system. Continental cannot be expected to operate without a license"). Significantly, these orders proceeded on a premise opposite to Comcast's premise.

9

1   These orders were based on the assumption that the franchises would lapse at the end of their
2   specified terms, not that they would automatically continue by operation of law.

3   This order holds both (1) and (2) of the three outcomes posited above are permissible
4   outcomes but not (3). Termination means termination, *i.e.*, that when a franchise expires it
5   expires — even if the renewal procedures have not been completed under Section 546. The
6   cable operator and the franchising authority may, however, enter into temporary written
7   extensions, as was done by Comcast's predecessor. Or, they may continue operations without a
8   formal agreement, *i.e.*, pursuant to a holdover tenancy subject to termination by either side at
9   will. *See Charter Communications, Inc. v. County of Santa Cruz*, 133 F. Supp.2d 1184, 1188
10  (N.D. Cal. 2001) (referring to a cable operator in this situation as a "holdover tenant"), *rev'd on*
11  *other grounds*, 304 F.3d 927 (9th Cir. 2002).

12  Nonetheless, a district court may, despite expiration, grant (or not grant) equitable relief
13  to carry out the purposes of the Act. The Act contemplates that the renewal procedures
14  mandated by Section 546 will be completed within three years. Section 546(a) requires the
15  cable operator to initiate formal renewal proceedings 30–36 months prior to the
16  franchise-expiration date. Congress presumably anticipated that this would provide sufficient
17  time for the franchising authority to complete the community-ascertainment process and obtain
18  a renewal proposal from the cable operator. Once the renewal proposal has been submitted,
19  Section 546(c) permits the franchising authority four months to make a decision regarding
20  whether to grant or deny renewal. These statutory deadlines suggest that the renewal process
21  was intended to run its course *before* the end of the current franchise. Indeed, one purpose of
22  the Act was "to establish an orderly process for franchise renewal which protects cable
23  operators against unfair denials of renewal." 47 U.S.C. 521(5).

24  One problem is that the franchising authority controls the length of time the renewal
25  process will take and determines whether the process will be completed by the time the
26  franchise expires. For example, the franchising authority determines how long community
27  ascertainment will take, sets the deadline for submission of renewal proposals, and then
28  determines the date of an administrative hearing on its decision. The franchising authority

10

1  should not stall the franchise-renewal process until the franchise has expired. Such a result
2  would contravene the intent of Congress that renewal procedures be fair and orderly and be
3  completed before the end of the franchise.
4      Thus, in circumstances where the franchising authority has stalled or frustrated the
5  orderly process under Section 546 to the detriment and prejudice of the cable operator, a district
6  court has equitable power to require the franchising authority to continue to honor the original
7  franchise agreement pending completion of the Section 546 process. (This would be true,
8  incidentally, even where the suit was brought *after* expiration rather than before, as in
9  Comcast's authorities, so long as laches were not present.)
10     This does not mean, however, that a court should automatically do so or automatically
11 go even a step further and order a franchising authority to permit the cable operator to rebuild
12 the cable system. The basic problem is one of equity. A court must do equity to both sides in
13 circumstances where the Section 546 process has not yet run its course. Circumstances can be
14 imagined where the equities would, in fact, warrant an order for an upgrade to go forward. For
15 example, if an upgrade were half-built at the time a franchise expired and the franchising
16 authority had frustrated the orderly process contemplated by Section 546, then circumstances
17 might well warrant an order to continue building the upgrade pending completion of the
18 Section 546 process.
19     The equities here, however, do not warrant relief. On the one hand, the Act
20 contemplates that the decision regarding a franchise renewal can be made in three years. The
21 City took five years to complete just the community-ascertainment component of the
22 franchise-renewal process (Valle-Riestra Decl. ¶¶ 8–9). This militates against the City and is at
23 least one indicator of delay. On the other hand, this factor is offset by repeated requests by
24 Comcast for extensions of the deadline for renewal proposals (*id.* at ¶ 9). Comcast had every
25 right to expect timely completion of the Section 546 franchise-renewal process. But, here,

11

1  Comcast has chosen to add its own delay to that of the franchising authority. Therefore, the
2  record does not warrant the drastic relief sought by Comcast.[2]
3        The foregoing is dispositive of Comcast's main argument, but a brief comment is in
4  order regarding the second step of the argument. Comcast points to no authority in support of
5  its second-step contention that Section 541(a) authorizes an *upgrade or rebuild* of a cable
6  system on top of the initial *construction* of such a system. Even if Section 541(a) could be
7  construed to create affirmative eminent domain rights during the term of an ordinary franchise
8  agreement (and this order does not so construe it), this provision would no longer have any
9  necessary effect under the foregoing analysis. That is, the terms of a franchise agreement are
10  deemed, at most, to continue on a terminable-at-will basis. There is no ongoing right under
11  Section 541(a).[3]

          *(ii)    Section 542(b).*

13        Plaintiffs also allege that the City has made unlawful demands as a condition to its
14  franchise renewal. Plaintiffs allege that the City has demanded that Comcast agree to payment
15  of public, educational and governmental ("PEG") operational support fees, in addition to the
16  maximum five percent franchise fee it already pays, and that such a demand violates the cap on
17  franchise fees in 42 U.S.C. 542(b) (Br. 20; Compl. ¶¶ 76, 107–110). At the hearing held on
18  April 21, 2005, however, counsel for Comcast conceded that the City has done nothing
19  unlawful in making public, educational, or government use an issue for negotiation. Indeed, 47

---

[2] After plaintiffs timely invoked their right to commence formal renewal proceedings, the City complied with the community-ascertainment requirement by issuing a "Joint Report on the Community's Cable Related Needs and Interests and Request for Renewal Proposals" on July 23, 2004. It is true that the City took a long time to complete this process, but the statute sets no express deadline for completion and there is no evidence in the record that plaintiffs at the time complained of the delay. Once that process was done, moreover, plaintiffs delayed the next step by seeking repeated extensions of the deadline for submission of a renewal proposal, which had been originally set for October 5, 2004. The ball is now in plaintiffs' court to submit a proposal for franchise renewal and obtain a final decision.

[3] 47 U.S.C. 541(a)(2) provides:

> Any franchise shall be construed to authorize the construction of a cable system over public rights-of-way, and through easements, which is within the area to be served by the cable system and which have been dedicated for compatible uses, except that in using such easements the cable operator shall ensure [that certain safety, appearance, cost, and just compensation concerns are addressed].

12

U.S.C. 531(b) expressly contemplates that a franchising authority may make such requests.[4] Nonetheless, the City Council has recently taken this issue off the table.

### (iii)   Section 544(e).

Plaintiffs also argue that the City's refusal to allow Comcast to upgrade its cable system to a fiber-optic based transmission technology violates 47 U.S.C. 544(e), which prohibits a franchising authority from restricting a cable system's use of any type of subscriber equipment or any transmission technology.[5] The issue here, however, is not merely the "subscriber equipment" or the "transmission technology." It is much larger. It involves the entire overall design of the physical infrastructure. In that regard, Section 544(b) authorizes a franchising authority to regulate an upgrade to a franchisee's cable system by setting requirements for facilities and equipment.

At all events, Comcast is a mere holdover tenant. It is not a current franchisee. The cited statutory rights do not apply.

### B.   First Amendment Claim.

Plaintiffs argue that the City's refusal to allow Comcast to upgrade its cable system violates Comcast's rights under the First Amendment in that Comcast is unable to provide additional programming services to its customers. Government regulation of a cable operator unrelated to the content of the cable operator's speech is evaluated under the

---

[4] 47 U.S.C. 531(b) provides:

> A franchising authority may in its request for proposals require as part of a franchise, and may require as part of a cable operator's proposal for a franchise renewal, subject to section 546 of this title, that channel capacity be designated for public, educational, or governmental use, and channel capacity on institutional networks be designated for educational or governmental use, and may require rules and procedures for the use of the channel capacity designated pursuant to this section.

[5] 47 U.S.C. 544(e) provides:

> Within one year after October 5, 1992, the Commission shall prescribe regulations which establish minimum technical standards relating to cable systems' technical operation and signal quality. The Commission shall update such standards periodically to reflect improvements in technology. No state or franchising authority may prohibit, condition, or restrict a cable system's use of any type of subscriber equipment or any transmission technology.

13

"intermediate scrutiny" standard of the First Amendment. Under that standard, a content-neutral governmental regulation will be sustained if (1) "it furthers an important or substantial government interest; (2) if the governmental interest is unrelated to the suppression of free expression; and (3) the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Turner Broad. Sys., Inc. v. FCC,* 512 U.S. 622, 636 (1994).

The City has interposed no content censorship. All the City has done is to insist on finalizing a renewal agreement before the rebuild and its attendant disruption takes place and the physical plant is locked in stone. The City has a legitimate governmental interest in protecting public safety and maintaining public thoroughfares. *Charter Communications, Inc. v. County of Santa Cruz*, 133 F. Supp.2d 1184, 1215–16 (N.D. Cal. 2001), *rev'd on other grounds*, 304 F.3d 927 (9th Cir. 2002). In support of this interest, the City has presented evidence of the disruption that rebuilding or upgrading a cable system may cause to the local community. The First Amendment does not require the City to run the risk that an agreement will never be reached and/or will be reached only after inordinate delay and/or that plaintiffs, no agreement having been reached, will simply walk away from their holdover tenancy, leaving Walnut Creek with an imperfect, unfinished and/or inoperable infrastructure. Thus, Condition No. 14 — requiring an agreement to be in place before Comcast can proceed with the rebuild — furthers the City's substantial interest in mitigating any disruption to public rights-of-way and other construction impacts.

Moreover, while Comcast objects to what it terms as the City's efforts to "force concessions" in the renewal-agreement negotiations related to an institutional network and PEG fees, Comcast has not identified any specific terms of a possible renewal agreement that would violate their First Amendment rights (Reply at 12; Compl. ¶¶ 106–109). Rather, Comcast objects to the very concept of finalizing a renewal agreement. There is no record that the City is advancing any unreasonable or unconstitutional terms in a renewal agreement. Indeed, as addressed above, the Cable Act expressly contemplates that a franchising authority may require an institutional network and PEG access as part of a franchise agreement. 47 U.S.C. 531.

14

1  Section 531 has been upheld against a facial First Amendment challenge based on franchising
2  authorities' substantial interests in ensuring "public 'access to a multiplicity of information
3  sources.'" *Time Warner Entertainment Co., L.P. v. F.C.C.*, 93 F.3d 957, 973 (D.C. Cir. 1996).

### 2. BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST.

Plaintiffs argue that they will be irreparably harmed on three bases. *First*, the City has statutory immunity for its cable-franchising related activities pursuant to 47 U.S.C. 555a, and thus, were Comcast to prevail on the merits at trial, it still would not be able to recover money damages.[6] This, however, does not prove *damages*, it proves only *irreparability*. *Second*, Comcast says violation of Comcast's First Amendment rights *ipso facto* constitutes irreparable injury. No such damages, however, have been shown, for the reasons stated above. *Third*, the City's imposition of Condition No. 14 is causing irreparable injury to Comcast's reputation and customer goodwill in the community (Br. 6–9). Comcast also argues that the public interest in widespread availability of cable services and competition among cable providers strongly favors issuance of an injunction (*id.* at 10–13). There is some merit to this argument. This order presumes that plaintiffs are losing customers to the competition and that the rebuild would help meet the competitive threat.

In response, the City argues that Condition No. 14 does not prohibit Comcast from rebuilding their cable system, but merely requires the cable operator to enter into a franchise or other agreement first. The City also argues that both the City and the public will suffer irreparable harm as a result of the significant impacts that construction for the rebuild will have on the community if the rebuild is allowed to go forward without an agreement in place. This harm would be all the worse if plaintiffs simply walked away from the process, as they would be entitled to do under the terminable-at-will relationship, or dragged it out indefinitely. There

---

[6] 47 U.S.C. 555a provides:

> In any court proceeding pending on or initiated after October 5, 1992, involving any claim against a franchising authority or other governmental entity, or any official, member, employee, or agent of such authority or entity, arising from the regulation of cable service or from a decision of approval or disapproval with respect to a grant, renewal, transfer, or amendment of a franchise, any relief, to the extent such relief is required by any other provision of Federal, State, or local law, shall be limited to injunctive relief and declaratory relief.

1    are clear hardships favoring the City.  In the Court's view, the hardships do not tip in favor of

2    plaintiffs, much less tip sharply in their favor.

                                    *          *          *

4         The Court is also persuaded that Comcast has been guilty of laches in seeking equitable

5    relief.  The September 2002 "Transfer of Control Consent Agreement," in which Comcast

6    assumed control over the franchises from AT&T, contained an important acknowledgment.

7    Section 5.2 of that agreement provided that (Opp. Exh. J) (emphasis added):

> Franchisees acknowledge that they made the following commitment to the City in 1999 during the change of control to AT&T, and that such agreement remains in full force and effect: *In the context of negotiations with the City for the renewal of its franchise following expiration of the current franchise, Franchisee will agree to a rebuild of its cable system in Walnut Creek* to a system with a capacity of not less than 750MHz with two-way capability, and to complete and fully activate such system within four (4) years of the date of the renewal.

In other words, Comcast acknowledged that it would negotiate the rebuild as part of the franchise-renewal negotiations.  Now it wants to renege on that agreement and sever the two items.  That Comcast not only failed to discuss the transfer agreement in any of its papers, but also neglected to include the agreement in any of its voluminous submissions, is a telling omission.

     Moreover, in its July 2003 letter to the City summarizing a recent meeting between the parties about the rebuild, Comcast acknowledged that it understood the City's position regarding a renewal agreement: "The City has made it clear that in order for Comcast to receive permits from the City to upgrade its cable system, a separate agreement or new franchise agreement was required" (Opp. Exh. K).  The language of the transfer agreement, in combination with the language of Comcast's July 2003 letter, shows that Comcast has known for almost two years (if not three) that the City would insist on finalization of a renewal agreement as a condition to the upgrade.  Comcast's unreasonable delay in seeking relief is one additional factor weighing against it now.

**CONCLUSION**

For the reasons stated above, plaintiffs' motion for preliminary injunction is **DENIED**.

**IT IS SO ORDERED.**

Dated: May 5, 2005.

                 /s/ WILLIAM ALSUP
                 WILLIAM ALSUP
                 UNITED STATES DISTRICT JUDGE